## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| JOANNA LEE BENSON, individually and on behalf of all others similarly situated, | ) ) ) | Court File _____ |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **CIVIL ACTION COMPLAINT** |
| ALEC C. COVINGTON, WILLIAM R. VOSS, CHRISTOPHER W. BODINE, MICKEY P. FORET, DOUGLAS A. HACKER, HAWTHORNE L. PROCTOR, NASH-FINCH COMPANY, SPARTAN STORES, INC., and SS DELAWARE, INC., | ) ) ) ) ) ) ) ) ) | **(Jury Trial Demanded)** |
| Defendants. | | |

## CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND INDIVIDUAL CLAIMS FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Joanna Lee Benson ("Plaintiff"), by her attorneys, alleges upon information and belief, except for her own acts, which are alleged on knowledge, as follows:

1.      Plaintiff brings this class action on behalf of the shareholders of Nash-Finch Company ("Nash-Finch" or the "Company") against the members of Nash-Finch's Board of Directors (the "Board" or the "Individual Defendants") for their breaches of fiduciary duties arising out of their attempt to sell the Company to Spartan Stores, Inc. ("Spartan") by means of an unfair process and for an unfair price. Plaintiff also brings claims *individually* against Defendants for their violations of Sections 14(a) and 20(a) of

the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On July 22, 2013, Spartan and the Company announced a definitive agreement under which Spartan, through its wholly owned subsidiary SS Delaware, Inc. ("Merger Sub"),  will acquire all of the outstanding shares of Nash-Finch in an all-stock transaction. Nash-Finch stockholders will receive 1.2 shares of Spartan common stock for each share of Nash-Finch common stock that they own (the "Proposed Transaction"). Based on the closing price of Spartan's stock on July 19, 2013, the day prior to the announcement of the Proposed Transaction, the implied value that Nash-Finch stockholders will receive is approximately $25.44 per share of Nash-Finch common stock. The Proposed Transaction is valued at approximately $1.3 billion, including existing net debt at each company, and is expected to close in the fourth calendar quarter of 2013. As described in more detail below, given Nash-Finch's recent strong performance as well as its future growth prospects, the consideration shareholders will receive is inadequate and undervalues the Company.

3.      The Board has breached its fiduciary duties by agreeing to the Proposed Transaction for grossly inadequate consideration. As described in more detail below, given Nash-Finch's recent strong performance as well as its future growth prospects, the proposed consideration shareholders will receive is inadequate and undervalues the Company.

4.      The Proposed Transaction is also the product of an inadequate sales process. The Board permitted Defendant Alec C. Covington ("Covington"), the

Company's President, Chief Executive Officer, and a member of the Board, to lead negotiations for the Company even though he had developed a strong relationship with Spartan's management as a result of prior unsuccessful attempts at business combinations. To ensure the Company completed a deal with Spartan, the Board *failed to contact one additional party* and entered an exclusivity agreement with Spartan before conducting any market check to gain an appreciation of Nash-Finch's intrinsic value.

5.      Defendants also agreed to lock up the Proposed Transaction with unreasonable deal protection devices that serve to prevent other bidders from making a successful competing offer for the Company. Specifically, pursuant to the merger agreement dated July 21, 2013 (the "Merger Agreement"), defendants agreed to: (i) a strict no-solicitation provision that prohibits the Company from soliciting other potential acquirers or from continuing ongoing discussions with potential acquirers; (ii) a provision that provides Spartan with five business days to match any competing proposal in the event one is made; and (iii) a provision that requires the Company to pay Spartan a termination fee of $12 million, on top of a $10 million expenses fee, in order to enter into a transaction with a superior bidder. These provisions unreasonably inhibit the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Nash-Finch.

6.      On August 20, 2013, Spartan filed a Form S-4 Registration Statement ("Registration Statement"), which contains the joint proxy statement of Nash-Finch and Spartan, with the United States Securities and Exchange Commission ("SEC") in support of the Proposed Transaction. The Registration Statement violates Sections 14(a) and

20(a) and Rule 14a-9 of the Exchange Act because it fails to provide the Company's shareholders with material information and/or provides them with materially misleading information. Without this information, shareholders will be unable to make an informed decision on whether to vote in favor of the Proposed Transaction and thus face irreparable harm.

7.     Therefore, Plaintiff seeks injunctive relief to ensure that Defendants cure their Exchange Act violations before Nash-Finch shareholders are asked to vote on the Proposed Transaction and that Defendants are not permitted to seek shareholder support of the Proposed Transaction without first complying with their duties under the federal securities laws to provide shareholders with all material information about the sales process, the proposed merger consideration, and the Company's intrinsic value.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 (federal question jurisdiction), as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

9.     The Court has personal jurisdiction over the Defendants because each Defendant is either organized under the laws of, conducts business in and maintains operations in this District, or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

11.    Plaintiff is, and has been at all relevant times, the owner of shares of Nash-Finch common stock.

12.    Nash-Finch is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal executive offices at 7600 France Avenue South, Minneapolis, Minnesota, 55435.

13.    Defendant Covington has been the President, Chief Executive Officer, and a director of the Company since May 2006.

14.    Defendant William R. Voss ("Voss") has been a director of the Company since 1998 and Chairman of the Board since May 2006.

15.    Defendant Christopher W. Bodine ("Bodine") has been a director of the Company since 2011.

16.    Defendant Mickey P. Foret ("Foret") has been a director of the Company since 2005.

17.    Defendant Douglas A. Hacker ("Hacker") has been a director of the Company since 2005.

18.     Defendant Hawthorne L. Proctor ("Proctor") has been a director of the Company since 2007.

19.     Defendants referenced in ¶¶ 13 through 18 are collectively referred to as the Individual Defendants and/or the Board.

20.     Defendant Spartan is a Michigan corporation with its headquarters located at 850 76th Street, S.W., P.O Box 8700, Grand Rapids, Michigan, 49518-8700. Spartan is a leading regional grocery distributor and retailer, operating principally in Michigan, Indiana, and Ohio. Spartan is the ninth largest wholesale distributor to supermarkets in the United States and the largest wholesale distributor to supermarkets in Michigan.

21.     Defendant Merger Sub is a Delaware corporation wholly owned by Spartan that was created for the purposes of effectuating the Proposed Transaction.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

22.     By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Nash-Finch and owe them, as well as the Company, a duty of care, loyalty, good faith, candor, and independence.

23.     Under Delaware law, where the directors of a publicly traded corporation undertake a transaction that will result in either a change in corporate control or a break up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders and, if such transaction will result in a change of corporate control, the shareholders are entitled

to receive a significant premium. To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

(d)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

24.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

25.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly

violating their fiduciary duties, including their duties of care, loyalty, good faith, candor, and independence owed to plaintiff and other public shareholders of Nash-Finch.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action as a class action with respect to her state law breach of fiduciary and aiding and abetting claims pursuant to the Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons and/or entities that owned Nash-Finch common stock (the "Class") as of July 22, 2013, the date on which the Proposed Transaction was announced. Excluded from the Class are Defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

27.    The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes that there are thousands of members in the Class. According to the Merger Agreement, as of July 21, 2013, approximately 12.3 million shares of common stock were represented by the Company as outstanding. All members of the Class may be identified from records maintained by Nash-Finch or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

28.    Questions of law and fact are common to the Class, including, *inter alia*, the following:

(i)    Have the Individual Defendants breached their fiduciary duties of undivided loyalty, independence, or due care with

respect to Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(ii)     Have the Individual Defendants breached their fiduciary duty to maximize shareholder value for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

(iii)    Have the Individual Defendants breached any of their other fiduciary duties to Plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

(iv)     Have the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives including offers from interested parties for the Company or its assets;

(v)      Whether Plaintiff and the other members of the Class would be irreparably harmed were the transactions complained of herein consummated;

(vi)     Have Nash-Finch, Spartan, and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duty; and

(vii)    Is the Class entitled to injunctive relief or damages as a result of defendants' wrongful conduct.

29.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

30.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

31.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

## FURTHER SUBSTANTIVE ALLEGATIONS

### *Company Background and its Poise for Growth*

32.     Nash-Finch is a Fortune 500 company and, in terms of revenue, is the largest food distributor serving military commissaries and exchanges in the United States. The Company's core business includes distributing food to military commissaries and independent grocery retailers, and distributing to and operating the Company's corporate-owned retail stores. Nash-Finch has three primary operating segments, including military food distribution, food distribution, and retail.

33.     The Company weathered the economic recession and has implemented new initiatives that position it for future growth. In a February 28, 2013 press release announcing the Company's financial results for quarter and fiscal year ended December 29, 2012, Defendant Covington identified areas for potential growth and highlighted how

Dollar General selected Nash-Finch to "distribute cigarettes and other tobacco products to Dollar General stores nationally[.]" In a conference call with investors that same day, Defendant Covington stated that the Company was "just getting started with ramping up a major tobacco initiative with Dollar General" and that the initiative was "just beginning now, as we speak, and it will add substantially to our top line." Covington also stated in the conference call that the Company has the "strongest pipeline of new business that I've seen in a number of years."

34.     Nash-Finch had a successful start to fiscal 2013. On April 25, 2013, the Company announced its financial results for the period ended March 23, 2013 and reported first quarter sales of $1.09 billion, a 2.3% increase compared to $1.07 billion for the comparable quarter of the prior year. Defendant Covington commented that the Company was "pleased with the increase in total company sales over last year, which was driven by sales increases in our combined food distribution and retail segments." Additionally, Covington stated in the press release that "[a]djusted EBITDA came in slightly better than we expected for the quarter." That same day in an earnings conference call with investors and analysts, Covington indicated that the Company outperformed his expectations and stated that "we [Nash-Finch] came in a little better than we had expected for the quarter."

35.     The Company maintained its momentum in the second quarter of 2013, for the period ended June 15, 2013. Days after announcing the Proposed Transaction, the Company release strong financial results. In a July 25, 2013 press release, Nash-Finch reported second quarter sales of $1.2 billion, a 9.1% increase compared to $1.1 billion in

sales for the first quarter of 2012. Covington stated in the press release that the Company was "pleased to report strong sales growth across all three of our business segments in the second quarter" and recognized that the "strategic investments made last year are now becoming evident in our top-line."

*A Conflicted Board Breached Its Fiduciary Duties by Failing to Contact Any Potential Purchasers and Focusing Exclusively On Negotiations With Spartan*

36.     The Board's decision to enter into the Proposed Transaction was the product of critical procedural defects. From the outset, the Board permitted management to funnel negotiations towards a deal with Spartan, the Company's preferred bidder, because Nash-Finch's management and their counterparts at Spartan had developed a close working relationship from prior negotiations between the two companies. To ensure the Company completed a deal with Spartan, the Board failed to contact one additional party and entered an exclusivity agreement with Spartan before conducting any market check to gain an appreciation of Nash-Finch's intrinsic value.

37.     As a preliminary matter, each Board member who approved the Proposed Transaction and is now urging shareholders to vote in favor of the Proposed Transaction suffers from material conflicts of interest. The Board is comprised of six directors and the five non-employee directors will each have a board seat in the surviving company. Moreover, Defendant Covington will serve as an "advisor" to the combined company. The Board also secured special benefits for other corporate insiders, such as Edward Brunot ("Brunot"), the president of Nash-Finch's military business. Brunot will be president of the military business in the combined entity.

38.     The Proposed Transaction is the latest of several attempts to complete a business combination between Nash-Finch and Spartan. Indeed, in mid-2011 Nash-Finch attempted to acquire 100% of Spartan's capital stock in an all-cash merger and at that time the companies signed confidentiality agreements, engaged in extensive negotiations, and conducted reciprocal due diligence throughout the summer of 2011. Ultimately, the Company's attempted acquisition failed but the "extensive due diligence" and negotiations helped the management teams of the respective companies "develop[] working relationships" with each other. Based on the strong working relationships that the management teams forged from their past dealings, Nash-Finch and its representatives worked to ensure that any strategic business transaction would involve Spartan, its favored bidder.

39.     On November 3, 2012, J.P. Morgan, who at the time was not formally serving as the Company's financial advisor, was invited to the Board meeting to make several presentations and provide a summary of "potential strategic alternatives for Nash-Finch." At the conclusion of the meeting the Board requested "further analysis from J.P. Morgan[]" about the firm's financial analysis and the Company's potential strategic alternatives.

40.     That same day Defendant Covington, apparently without Board authorization, took it upon himself to contact Dennis Eidson ("Eidson"), Spartan's President and Chief Executive Officer, to inform him that Nash-Finch "was interested in discussing a possible transaction."

41.     Approximately one and a half months after the November 3 Board meeting, the Board reconvened on December 20, 2012. At that time, J.P. Morgan provided the Nash-Finch Board with the additional presentations and information it requested on November 3 and only then did the Board authorize Covington to determine whether Spartan would be interested in a potential transaction.

42.     Further, the Board appointed Defendant Covington as the main contact for the negotiations with Spartan even though it knew that Covington would favor a deal with Spartan because of the close working relationships that the management teams developed from previous negotiations.

43.     On December 21, 2012, Defendant Covington contacted Eidson to inform him that the Company was interested in a potential transaction. Again acting without apparent Board authorization, Covington indicated to Spartan that Nash-Finch was interested in an "all-stock transaction." At this stage in the negotiations Covington was indicating that the Company was interested in an all-stock transaction before Nash-Finch hired a financial advisor. Indeed, the Board waited for over two weeks to engage J.P. Morgan even though it apparently did not consider contacting or interviewing any other financial advisors.

44.     On January 15, 2013, the companies began a new phase of due diligence, which supplemented the prior due diligence efforts from the 2011 negotiations. The parties engaged in extensive due diligence and began discussing the timing and structure of a transaction as early as February 27, 2013.

45. Throughout the negotiations and the lengthy due diligence efforts the Company *failed to contact one additional party* to gauge interest in the Company. Instead, the Board and management worked together to ensure that a transaction would be consummated with Spartan. In furtherance of this goal, on April 15, 2013 Spartan and Nash-Finch executed an exclusivity agreement that effectively precluded Nash-Finch from soliciting interest from other bidders or pursuing unsolicited indications of interest.

46. Several days after signing the exclusivity agreement, on April 25, 2013 Nash-Finch received an unsolicited indication of interest from a strategic competitor identified in the Registration Statement as Strategic Party A. The exclusivity agreement prohibited Nash-Finch from pursuing a transaction with Strategic Party A and Spartan refused to waive the agreement unless the Company paid Spartan $3 million dollars in the event that the Company entered into a transaction with Strategic Party A.

47. Additionally, Nash-Finch continued to negotiate the substantive terms of a deal with Spartan while it was waiting for Spartan's response about whether Spartan would waive the exclusivity agreement so that Nash-Finch could negotiate with Strategic Party A. Nash-Finch's actions signaled to Spartan that it was more interested in consummating a deal with its preferred partner than effectuating a competitive bidding process.

48. On May 3, 2013, Covington finally contacted Strategic Party A's chief executive officer to inform him that Covington was "coordinating further discussion" with the Board about Strategic Party A's April 25 indication of interest. Strategic Party A responded that it was no longer interested in pursuing a transaction with Nash-Finch at

that time. Covington's and Spartan's delay tactics, as well as Spartan's insistence on a $3 million fee in exchange for waiving the exclusivity rights, effectively deterred Strategic Party A from pursuing a transaction.

49.     After more than 5 months of exclusive negotiations between Nash-Finch and Spartan, spanning back to December 2012, the Company agreed to extend the exclusivity agreement with Spartan on June 4, 2013. The extension included an explicit provision requiring Nash-Finch to pay Spartan a $3 million fee in the event it entered an alternative transaction.

50.     Nash-Finch and Spartan executed the Merger Agreement on July 21, 2013. The Board failed to contact one potential purchaser, permitted Covington to spearhead negotiations with his counterpart at Spartan and with whom he had a strong relationship, and ensured that Spartan would emerge as the only purchaser by signing and extending exclusivity agreements with Spartan.

51.     Additionally, the Board failed to negotiate a collar, which would protect the Company's shareholders in the event that Spartan's stock price fell below a specified level before the consummation of the Proposed Transaction.

***The Proposed Transaction Fails to Maximize Shareholder Value***

52.     In a press release dated July 22, 2013, the Company announced that it had entered into a merger agreement with Spartan pursuant to which Spartan, through Merger Sub, will acquire all of the outstanding shares of the Company. Nash-Finch stockholders will receive 1.2 shares of Spartan common stock for each share of Nash-Finch common stock that they own. Based on the closing price of Spartan's stock on July 19, 2013, the

day prior to the announcement of the Proposed Transaction, the implied value that Nash-Finch stockholders will receive is approximately $25.44 per share of Nash-Finch common stock.

53.    Given the Company's recent strong performance and its positioning for growth, the Proposed Transaction consideration is inadequate and undervalues the Company.

54.    The Proposed Transaction provides virtually no premium since Nash-Finch's stock price closed at $25.43 on July 19, 2013, the last trading prior to the announcement of the Proposed Transaction.

55.    Nash-Finch stock had been trading well in excess of the Proposed Transaction implied offer price of $25.44. In fact, as recently as February 12, 2012, Nash-Finch's stock closed at $30.18 per share, which is approximately  $4.75 more than the implied consideration being offered in the Proposed Transaction.

56.    Further, according to Yahoo Finance, at least one Wall Street analyst set a price target of $26.00 per share.

57.    In addition, the Proposed Transaction consideration fails to adequately compensate Nash-Finch's shareholders for the significant synergies created by the Proposed Transaction. The Proposed Transaction is a strategic merger for Spartan. As stated in the July 22, 2013 press release announcing the Proposed Transaction, the combined company is "expected to achieve approximately $50 million in annual cost synergies by the third full fiscal year of operations, primarily derived from the consolidation of corporate functions, procurement and other operating efficiencies."

58.     Despite the significant synergies inherent in the transaction for Spartan, however, the Board failed to secure a fair price for the Company, either for the intrinsic value of its assets or the value of the Company's assets to Spartan.

59.     Spartan is seeking to acquire the Company at the most opportune time, at a time when the Company is performing very well and is positioned for tremendous growth.

**The Unreasonable Deal Protection Devices**

60.     In addition, as part of the Merger Agreement, Defendants agreed to certain onerous and unreasonable deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and potentially preclude competing offers from emerging for the Company.

61.     Section 6.2 of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting interest from other potential acquirers in order to procure a price in excess of the amount offered by Spartan. Section 6.1(i) requires that the Company terminate any and all prior or ongoing discussions with other potential acquirers.

62.     Pursuant to §6.2(ii) of the Merger Agreement, should an unsolicited bidder submit a competing proposal, the Company must notify Spartan of the bidder's identity and the terms of the bidder's offer. Thereafter, § 6.2(v) demands that should the Board determine to enter into a superior competing proposal, it must grant Spartan five business days in which the Company must negotiate in good faith with Spartan (if Spartan so desires) and allow Spartan to amend the terms of the Merger Agreement to make a

counter-offer so that the competing proposal no longer constitutes a "Superior Proposal." In other words, the Merger Agreement gives Spartan access to any rival bidder's information and allows Spartan a free right to top any superior offer simply by matching it. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor Spartan and allow it to piggy-back upon the due diligence of the foreclosed second bidder.

63.     The Merger Agreement also provides that the Company must pay Spartan a $12 million termination fee, in addition to a $10 million expenses fee, if the Company decides to pursue the competing offer, thereby essentially requiring that the competing bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

64.     Ultimately, these deal protection provisions unreasonably restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

***The Company's Materially Misleading Registration Statement***

65.     To make matters worse, on August 20, 2013 Spartan filed the Registration Statement with the SEC, which contained Nash-Finch's and Spartan's joint proxy statement, in an attempt to convince Nash-Finch shareholders to vote in favor of the

Proposed Transaction. The Registration Statement fails to provide the Company's shareholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's shareholders concerning the financial and procedural fairness of the Proposed Transaction. Without such information Nash-Finch shareholders cannot make a fully informed decision about whether to vote in favor of the Proposed Transaction.

      **A.**    *Material Omissions Concerning Nash-Finch's and Spartan's Prospective Financial Information*

66.    The Registration Statement fails to disclose material information concerning Nash-Finch's and Spartan's prospective financial information.

67.    With respect to the prospective financial information concerning Spartan that Nash-Finch's management reviewed, the Registration Statement should disclose the unlevered free cash flow, add a column for the figures for the partial year used in the *Discount Cash Flow Analysis*, and disclose whether Spartan's adjusted EBITDA figures are calculated by using Nash-Finch's formula or Spartan's formula and, if it is the latter, the Registration Statement should provide adjusted EBITDA figures based on Nash-Finch's formula.

68.    With respect to the prospective financial information concerning Nash-Finch that Spartan's management reviewed, the Registration Statement should disclose the unlevered free cash flows, add a column for the figures for the partial year used in the *Discount Cash Flow Analysis*, and disclose whether Nash-Finch's adjusted EBITDA

figures are calculated by using Nash-Finch's formula or Spartan's formula and, if the former, provide adjusted EBITDA figures based on Spartan's formula.

**B.    *Material Omissions Concerning J.P. Morgan's Financial Analysis***

69.    The Registration Statement fails to disclose certain data and inputs underlying the financial analyses supporting the fairness opinion of the Company's financial advisor, J.P. Morgan, including:

70.    The Registration Statement should disclose J.P. Morgan's calculation of fully diluted shares outstanding, equity value, and enterprise value for Nash-Finch and Spartan;

71.    The Registration Statement should disclose why J.P. Morgan did not conduct a precedent transactions analysis.

72.    With respect to the *Public Trading Multiples* analysis, the Registration Statement fails to disclose various material aspects of J.P. Morgan's analysis, including:

(a)    The objective selection criteria and company-by-company pricing multiples;

(b)    Whether J.P. Morgan examined other multiples and if so, which ones;

(c)    That Harris Teeter entered a merger agreement on July 8, 2013 to be acquired by The Kroger Co.;

(d)    An indication of whether any other company identified in the analysis is subject to being acquired or executed an agreement and plan of merger; and

(e)     The multiples for both Nash-Finch and Spartan at the July 19, 2013 closing price and based on the proposed exchange ratio;

(f)     Include individualized, company-by-company price ranges for each set of projections.

73.     With respect to the *Relative Discounted Cash Flow Analysis*, the Registration Statement fails to disclose various material aspects of J.P. Morgan's analysis, including:

(a)     Whether J.P. Morgan's analysis goes through calendar year 2022 because it extrapolated management's projections or management has projections through 2022, and if so, those projections should be disclosed;

(b)     A justification for the growth rates and an indication of the implied terminal EBITDA multiples; and

(c)     J.P. Morgan's weighted average cost of capital assumptions.

74.     With respect to the *Contribution Analysis*, the Registration Statement fails to disclose various material aspects of J.P. Morgan's analysis, including:

(a)     Distinguish the exchange ratios implied by Nash-Finch's and Spartan's respective EBITDA contributions from those implied by the companies' respective net income contributions.

**C.    *Material Omissions Concerning Moelis's Financial Analysis***

75.     The Registration Statement fails to disclose certain data and inputs underlying the financial analyses supporting the fairness opinion of the Spartan's financial advisor, Moelis & Company, LLC ("Moelis"), including:

76.     The Registration Statement should disclose Moelis's calculation of fully diluted shares outstanding, equity value, and enterprise value for Nash-Finch and Spartan.

77.     The Registration Statement should disclose why Moelis did not conduct a precedent transactions analysis.

78.     With respect to the *Selected Public Companies Analysis*, the Registration Statement fails to disclose various material aspects of Moelis's analysis, including:

(a)     The objective selection criteria and company-by-company pricing multiples;

(b)     Whether Moelis examined other multiples and if so, which ones;

(c)     That Harris Teeter entered a merger agreement on July 8, 2013 to be acquired by The Kroger Co.;

(d)     An indication of whether any other company identified in the analysis is subject to being acquired or executed an agreement and plan of merger; and

(e)     The multiples for both Nash-Finch and Spartan at the July 19, 2013 closing price and based on the proposed exchange ratio.

79.     With respect to the *Discounted Cash Flow Analysis*, the Registration Statement fails to disclose various material aspects of Moelis's analysis, including:

(a)     The weighted average cost of capital assumptions for Moelis's analysis of Spartan on a stand-alone basis and the Pro Forma Combined Company;

(b)     The terminal growth rates that were implied by the assumed terminal multiples; and

(c)     Moelis's discounted cash flow analysis for Nash-Finch on a standalone basis, and if it did not conduct such an analysis the reasons why.

80.     With respect to the *Relative Contribution Analysis*, the Registration Statement fails to disclose various material aspects of Moelis's analysis, including:

(a)     A description of the capital structure adjustments;

(b)     Whether other metrics were used, and if so, which ones; and

(c)     Disclose how Nash-Finch's and Spartan's multiples were weighted.

**D.     *Disclosures Concerning the Flawed Process***

81.     The Registration Statement states that "business combinations involving Nash-Finch and Spartan [], in various forms, have been proposed on a number of occasions by both companies for several years." The Registration Statement should disclose the material terms and timing of each proposed transaction, the party that proposed the transaction, and why the negotiations fell through or were otherwise not consummated.

82.     The Registration Statement states that on May 18, 2011 Nash-Finch offered to acquire "100% of the capital stock of Spartan" in an all-cash merger. The Registration Statement should disclose the material terms of Nash-Finch's offer, including price, when Nash-Finch transitioned from buyer to seller, and whether Nash-Finch ever offered to purchase Spartan at any time after the Company's May 18, 2011 offer.

83.     The Registration Statement should disclose whether J.P. Morgan was the Company's financial advisor in connection with Nash-Finch's May 18, 2011 offer  to purchase Spartan, the percentage of J.P. Morgan's $3 million fee that is contingent upon

the consummation of the Proposed Transaction, the amount of compensation Nash-Finch paid J.P. Morgan during the previous two years, and whether the Board interviewed banks other than J.P. Morgan to serve as the Company's financial advisor before retaining J.P. Morgan on January 7, 2013.

84.     The Registration Statement states that on December 21, 2012 Covington informed Eidson that Nash-Finch was interested in a "an all-stock transaction" but did not disclose whether the Board discussed that an all-stock transaction was preferable to other structures, whether the Board previously discussed the advantages and disadvantages of a stock, cash, or mixed cash and stock deal, whether pricing and exchange ratios were discussed, and if so, the implied value of Nash-Finch's stock based on the then-prevailing price of Spartan.

85.     The Registration Statement states that on March 25, 2013 Spartan sent Nash-Finch a written indication of interest to acquire all of the Company's outstanding shares for 1.12 shares of Spartan stock. The Registration Statement should disclose the implied value that Nash-Finch shareholders would receive based on the then-prevailing price of Spartan stock and the proposed 1.12 exchange ratio, as well as the concurrent closing price of Nash-Finch.

86.     The Registration Statement states that on April 2, 2013 J.P. Morgan sent Spartan a letter with proposed revisions to Spartan's March 25, 2013 indication of interest. The Registration Statement should disclose the specific revisions the Board requested in its April 2 letter and Spartan's April 10, 2013 revisions.

87.     The Registration Statement should disclose whether and if so, when, Strategic Party A knew that Spartan (or more generally another party) had been conducting due diligence on Nash-Finch since mid-January 2013, and whether pricing was discussed with Strategic Party A, and if so, the concurrent closing price for Nash-Finch.

88.     The Registration Statement states that on May 16, 2013 Spartan sent Nash-Finch a written indication of interest for an alternative structure that would give Nash-Finch shareholders a mix of cash and Spartan stock for an implied aggregate value of $25.00 per Nash-Finch share. The Registration Statement should disclose the concurrent closing price for Nash-Finch stock  and the reasons the Board felt that the transaction was an "unfavorable structure."

89.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIM FOR RELIEF

### COUNT I
**On Behalf of Plaintiff for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder
(Against the Individual Defendants and Spartan)**

90.     Plaintiff repeats all previous allegations as if set forth in full herein.

91.     Defendants have issued the Registration Statement with the intention of soliciting shareholder support of the Proposed Transaction.

92.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

93.     Specifically, the Registration Statement violates Section 14(a) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

94.     The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth.

95.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

## COUNT II
### On Behalf of Plaintiff for
### Violations of §20(a) of the 1934 Act
### (Against the Individual Defendants)

96.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

97.     The Individual Defendants acted as controlling persons of Nash-Finch within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Nash-Finch, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

98.     Each of the Individual Defendants were provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

99.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. Projected financial information was reviewed by the Board periodically at meetings. The Registration

Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

100.    In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger Agreement. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

101.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

102.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

103.    Plaintiff has no adequate remedy at law.

### COUNT III
**On Behalf of Plaintiff and the Class for Breach of Fiduciary Duties**
**(Against All Individual Defendants)**

104.    Plaintiff repeats all previous allegations as if set forth in full herein.

105.    The Individual Defendants have violated their fiduciary duties wed to the public shareholders of Nash-Finch and have acted to put their personal interests ahead of the interests of Nash-Finch shareholders.

106.    The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened judicial scrutiny of the Board's process and its obligation to maximize Nash-Finch's value for the benefit of the stockholders.

107.    The Individual Defendants have breached their fiduciary duties owed to the shareholders of Nash-Finch because, among other reasons:

(a)    they failed to take steps to maximize the value of Nash-Finch to its public shareholders and took steps to avoid competitive bidding;

(b)    they failed to properly value Nash-Finch; and

(c)    they ignored or did not protect against the numerous conflicts of interest resulting from the directors' own interrelationships or connection with the Proposed Transaction.

108.    As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Nash-Finch's assets and will be prevented from benefiting from a value-maximizing transaction.

109.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

110.    Plaintiff and the Class have no adequate remedy at law.

## COUNT IV
### On Behalf of Plaintiff and the Class
### For Breach of Fiduciary Duty -- Disclosure
### (Against the Individual Defendants)

111.    Plaintiff repeats all previous allegations as if set forth in full herein.

112.    The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose in a non-misleading way to Plaintiff and the Class all information material to the decisions confronting Nash-Finch shareholders.

113.    As set forth above, the Individual Defendants have breached their fiduciary duty through materially misleading disclosures and material disclosure omissions.

114.    As a result, Plaintiff and the Class members are being harmed irreparably.

115.    Plaintiff and the Class have no adequate remedy at law.

## COUNT V
### On Behalf of Plaintiff and the Class for Aiding and Abetting
### (Against Spartan and Merger Sub)

116.    Plaintiff repeats all previous allegations as if set forth in full herein.

117.    As alleged in more detail above, Defendants Nash-Finch, Spartan, and Merger Sub have aided and abetted the Individual Defendants' breaches of fiduciary duties.

118.    As a result, Plaintiff and the Class members are being harmed.

119.    Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally, as follows:

(A)    declaring this action to be a class action and certifying Plaintiff as the Class representatives and his counsel as Class counsel;

(B)    enjoining, preliminarily and permanently, the Proposed Transaction;

(C)    in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(D)    directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their violations of the Exchange Act;

(E)    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(F)    granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all counts and issues.

474053.1

32

Dated: September 19, 2013        Respectfully submitted,


s/   Karen H. Riebel
Karen H. Riebel, #219770
LOCKRIDGE GRINDAL NAUEN P.L.L.P
Suite 2200
100 Washington Avenue South
Minneapolis, Minnesota 55401-2159
Tel: (612) 596-4097

LEVI & KORSINSKY, LLP
Shane T. Rowley, Esq.
30 Broad Street, 24th Floor
New York, New York 10004
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*